

*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278*

May 6, 2025

**BY ECF**
The Honorable Paul G. Gardephe
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:   *United States v. Ronell Sweat,* 24 Cr 195 (PGG)

Dear Judge Gardephe:

     The Government respectfully submits this letter in advance of the sentencing of defendant Ronell Sweat, which is scheduled for May 13, 2025. On the morning of November 15, 2023, the defendant committed a violent shooting on a busy street in the Bronx. The victim and the defendant had both spent the evening at an underground club, which was cleared after a fight broke out. After leaving the club, the victim was standing at the end of the street, waiting for his ride to arrive, when the defendant began approaching from the far end of the street. The defendant continued walking towards the victim until the defendant was just a few feet away. The defendant then reached into his hoodie pocket and fired his gun from his pocket, shooting the victim in the stomach. The victim bent over and clutched his stomach, and the defendant then shot the victim a second time. The victim was thereafter rushed to the hospital with life-threatening injuries. The victim underwent emergency surgery, which required removing part of his small intestine and placing 32 staples around his torso. Luckily the victim survived and was discharged from the hospital after two-and-a-half weeks.

     The defendant's participation in this brazen and senseless act of violence, which nearly killed the victim, followed a series of extremely serious convictions, including a prior murder, for which the defendant was sentenced to 15 years to life and spent more than 18 years in prison. While in custody, the defendant committed numerous acts of violence, including assaults with weapons, and was further convicted for possessing contraband. Shortly after his release, the defendant threatened an MTA bus driver, saying "I'm gonna fuck you up," and punched the driver in the face. The defendant was again sentenced to a term of imprisonment and about a year-and-a-half after his release, and while he was on parole, the defendant committed the instant shooting. For the reasons described below, the Government submits that a Guidelines sentence of 180 months' imprisonment – as recommended by the Probation Department – is necessary to reflect the seriousness of the defendant's conduct, to protect the public from future acts of violence by the defendant, to promote respect for the law, and to ensure adequate general and specific deterrence.

A. **Procedural Background**

On April 2, 2024, a grand jury returned an indictment charging the defendant with one count of being a felon in possession of ammunition (the "Indictment").[1] On November 13, 2024, the defendant pled guilty to the one count in the Indictment. The Probation Department thereafter prepared a draft presentence report, and the defendant did not raise any objections. (PSR at 23).

B. **Factual Background**

On the evening of Tuesday, November 14, 2023, the defendant and the victim both attended a party at an underground night club in the Bronx. (PSR ¶ 8). The party continued into the early morning hours of Wednesday, November 15, 2023, when a fight broke out. (PSR ¶ 8). One individual in the club recorded a portion of the fight in a video attached hereto as Exhibit A. The defendant, who can be identified from his bald head and light-colored track suit, is seen on the periphery of the fight.



Around this same time, a man wearing a black jacket and pants and a white t-shirt and sneakers ("Individual-1"), left the club and then attempted to re-enter with a gun, but was stopped at the door, and the gun was temporarily taken from him and then returned.[2] *See* (Ex. B at 1:16:48 (leaving the club); 1:23:33 – 1:24:05 (saying "they don't want to let me back in bro," and yelling "come to the door"); 1:24:47:44 – 1:24:55 (struggle at the door where Individual-1 appears to pull out a gun); 1:24:55 – 1:25:30 (struggle where man takes the gun from Individual-1 and then returns it)).[3] Screenshots of the surveillance video, showing Individual-1 and the person who temporarily

---

[1] The Presentence Report ("PSR") states that the indictment was a two-count indictment, (PSR ¶ 1), however, that appears to be a typo.

[2] The Government has included additional details about the events leading up to the shooting given allegations that the defendant raised in its sentencing submission.

[3] The Government asks that Exhibits B, C, D and E be filed under seal given that they show the victim and other witnesses on camera and contain excerpts from the victim's sensitive medical records.

took the gun from Individual-1 are below.  Individual-1 ultimately walked to a white car that was double-parked in front of the club.



      Shortly thereafter, the defendant exited the club with a group of people and appeared to be agitated and yelling.  (*Id.* at 1:26:45 – 1:27:15).  The defendant then approached Individual-1, who was standing next to the white car, and the two appeared to engage in conversation, including with another man and two women.  (*Id.* at 1:27:10 – 1:28:30).  The defendant's group then yelled at a man who was walking down the street.  (*Id.* at 1:28:30 – 1:28:53).  Around the same time, the victim walked out of the club as it continued to clear and walked down the street, away from the club and the defendant.  (*Id.* at 1:28:30 – 1:29:00 (see below screenshot showing victim leaving the club)).



Although there appeared to be some argument between the defendant's group of friends and others exciting the club, the victim did not appear to participate in that exchange. (*Id.* at 1:28:52).[4] The defendant then went inside the white car and after a short period of time, exited and began to walk down the street, as the white car drove in the same direction. (*Id.* at 1:31 – 1:32:50; PSR ¶ 9).

The defendant's shooting was captured on surveillance video attached hereto as Exhibit C. As shown in the video, the defendant walked in a slow, unhurried manner, from one end of the street to the other, where the victim and others were gathered at the corner. (Ex. C at 0:20; PSR ¶ 9). As he got closer to the victim, the defendant repeatedly put both of his hands up, attempting to show that he was not a threat. (Ex. C at 0:50-0:53; PSR ¶ 9). The defendant continued to approach the victim, as the victim and others attempt to leave the area, and as the defendant got closer, he put his hand inside his hoodie pocket. (Ex. C at 0:55-0:58). The defendant took another step towards the victim, until he was just a couple of feet away. (Ex. C at 1:00; PSR ¶ 9). The defendant then pointed his gun, which remained inside his hoodie pocket, at the victim, and shot the victim in the stomach. (Ex. C at 1:02; PSR ¶ 9). The muzzle flash of the gun was captured in the video.



Upon being shot, the victim doubled over and grabbed his stomach. (Ex. C at 1:01; PSR ¶ 9). The victim then turned to run away, and the defendant walked towards the victim, pulled out his gun and fired again, hitting the victim again in the stomach. (Ex. C at 1:02 – 1:06; PSR ¶ 9). Not only were there numerous people on the street at the time of the shooting, but many cars were driving by, including a school bus, which was directly across the street from the shooting.

---

[4] The victim is identifiable from his physical build, the bright orange shirt under his dark-colored hoodie, and his braided hair.



.
Surveillance video that captured the audio of the gunshots further showed that the second gunshot occurred several seconds after the first, rather than immediately after.  The first gunshot is heard (Ex. B at 1:33:32), followed by a pause, and then a second gunshot (Ex. B at 1:33:37).  People on the street are seen running for their lives away from the defendant's gunfire.  (Ex. B at 1:33:44).

After being shot twice, the victim and his friends ran across the street to escape and then got into a car to race to the hospital.  A bystander took a video, attached as Exhibit D, showing the victim collapsing on the ground and then being carried into a car that drove away.  (PSR ¶ 9).  Following the shooting, the defendant sent the video to friends on Facebook, explaining that things "went all the way bad."  (PSR ¶ 12).

The victim arrived at the hospital in critical condition.  According to medical records, a portion of which are attached hereto, the victim had four entry wounds in the abdomen (consistent with two gunshot wounds), was in "hemorrhagic shock," at first had "no blood pressure," and had a "heart rate in the 140s."  (Ex. E at 1).  A "[m]assive [blood] transfusion protocol" was initiated." (Ex. E at 1).  The victim was then taken to the operating room for a "high risk operation."  (Ex. E at 2).  During the surgery, a portion of the victim's small intestine was removed, and other parts of his intestine were sewn together.  (Ex. E at 4).  The victim had 32 staples placed along his torso following the surgery and was transferred to critical care.  (PSR ¶ 10).  The victim remained intubated on a mechanical ventilator for two days, was in the hospital for two and a half weeks, and has permanent scarring as a result of the shooting.  (Ex. D at 7-8; PSR ¶ 10).  The victim was just 21 years old at the time of the shooting.  (PSR ¶ 10).

Responding officers recovered two shell casings from the area where the defendant committed the shooting.  (PSR ¶ 11).

**D.     The Defendant's Allegations**

The defendant asserts, without any citation, that the "so-called victim and his young confederates engaged in a knife point attack against Ronell Sweat and his friends who were escorting three young beautiful Dominican women . . . in a drunken jealous rage fueled by racism and ignorance." (Def. Mem. at 3). The defendant further claims that "Ronell Sweat and his friends, in their 40s, were viciously assaulted in an unprovoked attack, simply because the young Dominican men were outraged that these middle aged African American men were escorting three beautiful Dominican . . . women." (*Id.*). The defendant further claims that "Ronell Sweat and his friends were greatly outnumbered, and during the attack[] Ronell Sweat was, in fact, stabbed – though not resulting in any serious physical injury." (*Id.*). The defendant further criticizes the victim and his friends for not mentioning "their unprovoked knife point attack." (*Id.*).

The defendant has since clarified that he intends to support these allegations based entirely on the surveillance video. The Government respectfully submits that at no point during the surveillance video is the victim seen engaged in a fight, nor is anyone seen with a knife, much less seen attacking the defendant with a knife. Moreover, at no point during the surveillance video, when the defendant is calmly walking down the street, does the defendant appear to be injured. Indeed, the defendant was wearing a light-colored track suit, which shows no sign of blood. Moreover, the defendant apparently never sought medical attention for this supposed knife injury. Accordingly, the Government submits that the Court should disregard these allegations which are not supported by the record.

**E.     The Defendant's Criminal History**

The defendant committed this shooting following a long history of serious, violent, criminal conduct, which is all the more concerning given the limited amount of time that the defendant has spent out of custody. The defendant's criminal conduct began when he was 16 years old, and adjudicated a youthful offender for criminal facilitation in the fourth degree, after he sold a controlled substance to an undercover officer. (PSR ¶ 30). A month after his sentencing, the defendant was re-arrested and later convicted of attempted criminal sale in the third degree, for selling cocaine, for which he received a sentence of 6 months' imprisonment and 5 years' probation. (PSR ¶ 31). In May 1996, the defendant was arrested in possession of a loaded firearm (PSR ¶ 32); months later in July, and while the case was pending, the defendant was arrested for shooting a victim multiple times and killing him. (PSR ¶ 33). Ultimately, the defendant was convicted of criminal possession of a loaded firearm in the third degree for his May 1996 arrest, for which he received 3 years' imprisonment. (PSR ¶ 32). The defendant was also convicted of intentional murder for the July killing and sentenced to 15 years to life imprisonment. (PSR ¶ 33).

The defendant served nearly 19 years in prison for the murder, and while in custody, the defendant engaged in egregious misconduct. Indeed, early into his prison sentence, the defendant was arrested and convicted of possessing contraband, for which he received 60 days' imprisonment. (PSR ¶ 34). However, this conviction did little to deter the defendant's misconduct, and the defendant participated in 23 different incidents of misconduct, including 13 that involved violent conduct and assaults and 3 of which involved weapons. For example, in February 2009, when the defendant was 31 years old, he was cited for violent conduct, assault on an inmate, and

providing false information, for which he received, among other things, 9 months and 20 days in solitary housing. (PSR ¶ 33). And this incident followed a string of other violent conduct, fighting and assaults, including the following:

- June 23, 2008 – violent conduct; fighting; create disturbance; direct order
    - 2 months and 24 days in solitary housing
- March 27, 2006 – assault on inmate; fighting; weapon; create disturbance
    - 20 months and 20 days in solitary housing
- December 3, 2004 – violent conduct; fighting; direct order
    - 5 months in solitary housing
- October 31, 2003 – violent conduct; direct order
    - 106 days' keeplock
- September 6, 2001 – assault on staff; violent conduct; create disturbance; search/frisk; harassment
    - 9 months and 16 days in solitary housing
- May 30, 2001 – violent conduct; fighting; direct order
    - 10 days' keep
- July 29, 1999 – weapon; assault on inmate; fighting; out of place
    - 549 days in solitary
- October 10, 1998 – violent conduct; fighting; create disturbance; direct order
    - 45 days' keeplock
- August 2, 1997 – arson; loss/damage property
    - 21 days' keeplock
- July 28, 1997 – assault on inmate
    - 2 months in solitary housing
- July 27, 1997 – violent conduct; threats; create disturbance
    - 1 month keeplock
- July 7, 1997 – weapon; assault on inmate
    - 10 months and 17 days in solitary

The defendant was paroled in March 2015, and about a year and a half later, while still on parole, the defendant was arrested after threatening an MTA bus driver saying, "I'm gonna fuck you up," and then punching the driver in the face, causing swelling and pain. (PSR ¶ 35). The defendant then attempted to resist arrest, including by kicking and flailing his arms and legs, causing one of the arresting officers to rupture his Achilles tendon. (PSR ¶ 35). The defendant was convicted of two counts of attempted assault in the second degree and sentenced to two to four years' imprisonment on Count One, and eighteen months to three years' imprisonment on Count Two, to run consecutive. (PSR ¶ 35). While in custody for this offense, the defendant was sanctioned for drug use and violent conduct. (PSR ¶ 35).

The defendant was paroled in April 2022, and about a year and a half later, while still on parole, the defendant committed the instant offense.

### F.     The Applicable Guidelines Range

The Government respectfully submits that the Presentence Investigation Report ("PSR") correctly calculates that the defendant's offense level is 34 and his criminal history category is III, which would result in a Guidelines range of 188 to 235 months' imprisonment. Because of the statutory maximum sentence of imprisonment of 180 months' imprisonment, however, the Guidelines Sentence is 180 months' imprisonment.

The defendant objects to the application of the attempted first-degree murder guidelines under U.S.S.G. §§ 2K2.1(c)(1)(A) and 2A2.1(a)(1)(A). However, this objection should be rejected because the evidence clearly shows that the defendant's shooting was premediated, attempted first degree murder.

#### 1.     The Attempted First-Degree Murder Guidelines Apply Here

The defendant first argues that he did not commit an attempted first-degree murder because he did not intend to kill the victim. (Def. Mem. at 5).

The defendant claims that there is insufficient evidence that the defendant acted with premeditation and intent to kill the victim. "[I]t is well-settled that, as a general matter, criminal intent may be proven by circumstantial evidence," and that a factfinder may infer "that a person intends the ordinary consequences of his voluntary acts." *United States v. Nelson*, 277 F.3d 164, 197 (2d Cir. 2002). Thus, the requisite intent for attempted murder may be inferred from circumstantial evidence. *See, e.g.*, *United States v. Kwong*, 14 F.3d 189, 194 (2d Cir. 1994).

Here, the evidence plainly demonstrates that the defendant acted with the requisite intent to kill. First, the defendant fired the gun at the victim at close range. As is evident from surveillance footage, the defendant was just a couple of feet from the victim when he shot him in the stomach. *See, e.g.*, *United States v. Atehortva*, 69 F.3d 679, 687 (2d Cir. 1995) (concluding that a district court could find intent to murder where there was "undisputed evidence that [the defendant] repeatedly fired a gun at federal agents from close range"); *United States v. Stroman*, 498 F. App'x 67, 69 (2d Cir. 2012) (affirming district court determination that attempted murder was intentional based on observation that surveillance video showed that defendant pursued two men into a grocery store and fired gun at them at close range); *United States v. Muyet*, 994 F. Supp. at 518-19 (collecting New York state cases which outline intent to kill, including cases involving defendants who point and fire guns at their intended victims at close range); *United States v. Ashburn*, No. 11 Cr. 303 (NGG), 2015 WL 5098607, at *17 (E.D.N.Y. Aug. 31, 2015) (citing New York state cases which establish that "shooting a firearm at close range generally evidences the intent to kill, not seriously injure"); *United States v. Rodriguez*, No. 12 Cr. 73 (JGM), 2015 WL 3454725, at *2 (D. Vt. May 29, 2015) ("[F]iring multiple shots at close range and preventing any mitigation of the damage is sufficient to establish intent to kill.") (citations omitted), *aff'd*, 626 F. App'x 314 (2d Cir. 2015); *see also People v. Gonzalez*, 216 A.D.2d 412, 628 N.Y.S.2d 726, 727 (1995) (intent established by defendant's overt acts of brandishing gun, turning it towards the intended victim, and firing it at least twice); *People v. Van Buren*, 213 A.D.2d 504, 623 N.Y.S.2d 906, 907 (1995) (evidence sufficient to establish attempted murder where defendant pointed gun at police officer and fired); *see also, United States v. Belmar*, No. 21-CR-16 (KMW), 2024 WL

2798860, at *4 (S.D.N.Y. May 31, 2024) ("Distances of up to 15 to 20 feet have been described as 'close range.'"). In fact, rather than shooting at the victim from down the street, the defendant purposefully walked as close as possible to the victim, before secretly firing the gun he had hidden in his hoodie pocket.

Second, the defendant did not shoot in the air or at the ground or as might support an argument for reckless endangerment, but instead fired directly at the victim and at his torso — a level aimed to kill. *See United States v. Green*, No. 21-CR-431, ECF No. 55 (Kaplan, J.) at 10-11 (applying first degree murder cross-reference after noting that the shots were not warning shots because "[y]ou don't fire [warning shots] at a level that's roughly equivalent to the torso of a human being standing on the sidewalk rather than up in the air"). Indeed, the victim's medical records show that he very nearly died from the gunshot wounds.

Third, the defendant fired a second shot, even after seeing that his first successfully hit the victim. And the defendant's second shot occurred seconds after the first, as the victim attempted to run away, and also hit the victim in the abdomen. It is thus evident from these facts that the defendant shot with intent to kill the victim.

The evidence of the defendant's brazen shooting demonstrates that he not only attempted to kill the victim, but that he attempted to commit first degree murder. As the Court is aware, the distinction between attempted murder, which would involve a base offense level of 27, and attempted first degree murder, which has a base offense level of 33, is the presence of premeditation. As is well-established in the caselaw, premeditation does not need to be formed any set amount of time prior to the shooting, rather it only requires enough time "after forming the intent to kill, for the killer to have been fully conscious of the intent and to have considered the killing." *United States v. Whiteside*, 207 F. Supp. 3d 311, 321 (S.D.N.Y. 2016) (internal citation and quotation omitted); *see also United States v. Shaw*, 701 F.2d 368, 392 (5th Cir. 1983) (finding "no particular period of time is necessary for such deliberation and premeditation"). Here, the defendant took a loaded gun, which he kept hidden, but easily accessible in his hoodie pocket, and walked all the way down the street to where the victim was standing. The defendant took care to get as close as possible to the victim, by putting his hands up to attempt to show that he didn't have anything on him and did not pose a danger. After getting within a foot or two of the victim, the defendant then put his hand into his hoodie pocket and fired the gun. The defendant shot the victim as the victim was attempting to leave the area. Indeed, the victim was not even looking at the defendant when the defendant shot him.

After hitting the victim in the stomach, the defendant then pulled his gun out of his pocket, turned to the victim, who was trying to run away, and fired again. These were two very purposeful and separate shots, both aimed to kill the victim. The evidence is clear that the defendant's entire reason for walking down all the way down the street was to shoot the victim, which he did twice. Immediately after the shooting, the defendant then used his gun to direct the nearby cars to drive away, and calmly left the scene. *United States v. Rodriguez*, 738 F. App'x 729, 730 (2d Cir. 2018) (finding sufficient evidence of premeditation where defendant, upon shooting into a vehicle at close range, "calmly [left] the scene of the shooting").

The defendant appears to argue that there is insufficient evidence of intent to kill because the Government has not offered evidence regarding the defendant's motivation. But, as the defendant acknowledges, and as the Second Circuit has held, "motive is not an element of attempted murder, and the absence of motive evidence does not preclude a finding that a defendant had a specific intent to kill." *United States v. Reid*, No. 22-1279, 2023 WL 8469353, at *2 (2d Cir. Dec. 7, 2023).

The defendant also argues that there was no intent to kill because the defendant could have shot more times, could have run after the victim, and could have shot other people, but didn't. With respect to the victim, there is no requirement that a defendant fire "multiple shots" at an intended victim for a court to find that the defendant possessed a "specific intent to kill." *Id*. Nonetheless, here the defendant did shoot at the victim twice. The fact that he didn't shoot at the victim three or more times, does not undermine the fact that the first two shots were a premediated, attempted killing. Moreover, the fact that the defendant could have chased after the victim further and didn't is of no moment. The victim was already in the process of running away, the shooting was occurring in a public street, with many witnesses nearby and there were thus many reasons for the defendant not to continue after the victim. *See*, *United States v. Simmons*, 22 Cr. 399 (VEC) (Dkt. 79) (sentencing July 11, 2023), *aff'd* 2025 WL 615459 (2d Cir 2025) (finding first degree attempted murder where the defendant shot the victim at close range in the leg, and rejecting defense counsel's arguments that he would have shot more times if he intended to kill).

The fact that the defendant didn't shoot other people who were standing at the street corner is entirely beside the point. The defendant does not have to engage in a mass shooting for the Court to find that he acted with the intent to kill.

Where, as here, someone repeatedly fires a gun at close range directly at another person, the only logical conclusion is that the shooter is intending to kill the target. Indeed, it is by pure luck that the victim, or other innocent bystanders like people in the cars or school bus that were driving by, were not killed by the defendant's firing of shots on a busy street.

C. **Discussion**

1. **Applicable Law**

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6.

### 2. A Guidelines Sentence Is Necessary in This Case

The Government respectfully submits that a Guidelines sentence of 180 months' imprisonment is necessary to achieve the legitimate purposes of sentencing. In particular, a Guidelines sentence is appropriate given the seriousness of the defendant's conduct, which nearly took a human life, the need to protect the public from the defendant, who has a long history of violence, the need to promote respect for the law, and the need to assure both general and specific deterrence.

*First*, the incredibly serious nature of the defendant's conduct necessitates a 180-month sentence. The defendant's shooting in broad daylight in the middle of a busy street could have easily killed the victim or any number of other bystanders, including people walking down the street or driving by in their car or in the school bus. The defendant's senseless actions not only placed multiple lives in danger, it caused serious physical injury to the victim, and almost killed him. This conduct – in and of itself – justifies a Guidelines sentence.

*Second*, a Guidelines sentence is also necessary to protect the public from future acts of violence by the defendant. This is the defendant's seventh conviction, which is all the more alarming given the fact that the defendant has spent the vast majority of his adult life in prison. Indeed, the defendant has been unable to remain in society as an adult for even two years without committing a violent criminal offense. Further troubling is that the defendant engaged in this violent shooting after a prior conviction for intentional murder, for which the defendant spent nearly 19 years in prison. The defendant's history of violence is truly astounding and raises the highest level of concern about his danger to the public. The defendant's conduct while serving his time in prison for murder was marked by repeated acts of serious violence, some of which involved weapons. And the defendant's violence continued despite being placed in solitary confinement for months on end and even being further prosecuted for criminal conduct while in custody. The defendant continued his violence after he was released, threatening and punching an MTA bus driver. And the defendant committed the instant offense while on parole for that offense. Simply put, the defendant is a violent person who time and again chooses to use guns and violence to harm other individuals without any regard for the safety of others. The shooting in this case was an utterly senseless act of violence and the defendant's willingness to resort to shooting another person makes clear that he is a danger to the community, and his detention for 180 months is critical to protecting the community at large.

*Third*, a Guidelines sentence is also appropriate to ensure general and specific deterrence. With respect to general deterrence, a Guidelines sentence would send an important message that individuals with felony convictions who use ammunition to repeatedly shoot at another person will face a serious sentence of imprisonment. As Your Honor is no doubt aware, increasing gun violence has a significant impact on our communities, many of whom, as reflected in the instant offense are being forced to live amongst ongoing threats of violence erupting on their street at a moment's notice. Indeed, the defendant argues for leniency on the grounds that he grew up in a violence-ridden neighborhood, yet, the defendant has time and again been the source of extreme violence in his community, which killed one person, almost killed a second, and has threatened the lives of many.

With respect to specific deterrence, as set forth above, given the defendant's extremely violent criminal history, a serious sentence of imprisonment is needed to have any hope of deterring this defendant from further acts of violence. The fact that the taking of another human life and the resulting 19 years the defendant spent in custody for that offense did not dissuade the defendant from getting involved in this senseless act of violence that very nearly took another human life raises the highest level of concerns for the defendant's risk of recidivism and his defendant's danger to the community. The defendant has now demonstrated on two separate occasions that he is ready and willing to take a human life through gun violence, and a serious sentence of imprisonment is required to make clear that such actions cannot and will not be tolerated.

### 3. The Defendant's Arguments For a Below-Guidelines Sentence Should Be Rejected

The defendant asks the Court to impose a below-Guidelines sentence, but none of the defendant's arguments are persuasive.

*First*, the defendant points to the difficulties he faced in childhood growing up in the Bronx with a single, working mother. While the Government acknowledges these difficulties, a substantial portion of individuals who appear before the Court for sentencing have also had difficult upbringings, with many far worse than reported in the defendant's PSR. And while the defendant's background is a relevant consideration for the Court, so is the fact that the overwhelming majority of people with difficult upbringings do not choose to shoot someone repeatedly in the middle of a busy street, with many people nearby. Moreover, the defendant was 45 years old at the time he committed this shooting. Accordingly, as a middle-aged man, he has had decades to learn from his mistakes and to understand the consequences of his actions.

*Second*, the defendant cites to the Judiciary Sentencing Information, which found that from 2019 to 2023, 15 defendants were sentenced with the same guidelines offense level and criminal history category as the defendant and the average sentence of imprisonment was 161 months and the median was 150 months. The Government respectfully submits that this data is of particularly limited use in this case given that Section 922(g) had a statutory cap of 120 months until June 2022, and even after that, was only effective for crimes committed after that date. The amendment of the statutory cap was of course intended to reflect that gun violence of the type that the defendant engaged in is a serious crime, which requires a serious level of imprisonment.

**D.**     **Conclusion**

    For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 180 months' imprisonment.

                          Respectfully Submitted,

                          JAY CLAYTON
                          United States Attorney

            by:   /s/ Courtney Heavey
                  Courtney L. Heavey
                  Assistant United States Attorney
                  (212) 637-2413